**FILED**

APR 2 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------X

RUTH CALDERÓN-CARDONA for the ESTATE OF  
CARMELO CALDERÓN-MOLINA  
408 Calle Pedro Díaz  
Urb. Del Carmen  
San Juan, PR 00923

   and

RUTH CALDERÓN-CARDONA  
408 Calle Pedro Díaz  
Urb. Del Carmen  
San Juan, PR 00923

   and

LUZ CALDERÓN-CARDONA  
408 Calle Pedro Díaz  
Urb. Del Carmen  
San Juan, PR 00923

   and

LUIS CALDERÓN-CARDONA  
Calle 11, RF-9  
El Conquistador  
Trujillo Alto, PR 00976

   and

GLORIA CALDERÓN-CARDONA  
Calle 433, Bloque 156, Lote 11  
Villa Carolina, PR 00985

   and

JOSÉ RAÚL CALDERÓN CARDONA  
Laguna Gardens II, Apt. A-4  
Urb. Los Angeles  
Carolina, PR

   and

**Civil Action No** ·

CASE NUMBER 1:06CV00744

JUDGE: Reggie B. Walton

DECK TYPE: Personal Injury/Malpractice

DATE STAMP: 04/24/2006

JURY ACTION

ANA DELIA CALDERÓN-CARDONA
Urb. Country Club
3400 NC 17
San Juan, PR

      and

HILDA CALDERÓN-CARDONA
Paisajes de Escorial S-10
Carolina, PR 00987

      and

SALVADOR CALDERÓN- MARTÍNEZ
Calle Cuba #457
Hato Rey, PR 00917

      and

PABLO TIRADO-AYALA
Road 643,
Km 2.3 Interior
Bo. Pugnado. Manati, PR 00674

      and

ANTONIA RAMIREZ-FIERO
Road 643,
Km 2.3 Interior
Bo. Pugnado. Manati, PR 00674

           Plaintiffs,

      vs.

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,
a.k.a. NORTH KOREA
Ministry of Foreign Affairs
c/o Foreign Minister, Paek Nam Sun
Jung song-dong, Central District
Pyong Yang, DRK

      and

CABINET GENERAL INTELLIGENCE BUREAU,
a.k.a. NORTH KOREAN INTELLIGENCE SERVICE

c/o Foreign Minister, Paek Nam Sun     :
Jung song-dong, Central District      :
Pyong Yang, DRK         :
Office of the General Secretary of the Korean Workers' :
Party.             :
              :
       Defendants.   :

------------------------------------------------------------------------X

Plaintiffs Ruth Calderón-Cardona for the Estate of Carmelo Calderón-Molina, Ruth Calderón-Cardona, Luz Calderón-Cardona, Luis Calderón-Cardona, Gloria Calderón-Cardona, José Raúl Calderón-Cardona, Ana Delia Calderón-Cardona, Hilda Calderón-Cardona, Salvador Calderón-Martínez, Pablo Tirado-Ayala, and Antonia Ramirez-Fiero, by their attorneys, allege the following upon information and belief:

## COMPLAINT FOR DAMAGES

1.  This action is brought by the estate and families of American nationals, as that term is defined in § 101(a)(22) of the Immigration and Nationality Act, who were the victims of an international terrorist attack at Israel's Tel Aviv Airport, against the government of the Democratic People's Republic of North Korea ("North Korea") and the Cabinet General Intelligence Bureau ("CGIB") for wrongful death, personal injuries and related torts.

2.  Defendant North Korea is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603.

3.  Defendant has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)).

4.  Defendant the CGIB is Defendant North Korea's main intelligence and security agency tasked with conducting espionage, analyzing intelligence and carrying out hostile operations against North Korea's foreign opponents, including maintaining support for numerous international terrorist organizations.

5.  At all times relevant to this complaint the CGIB was an official North Korean

government agency reporting directly to North Korea's supreme leader, the General Secretary of the Korean Workers' Party. Within the scope of its agency and office, the CGIB provided material support and resources for terrorism and performed actions that caused grievous injury to the Plaintiffs.

6.    Plaintiffs bring this action pursuant to the Anti-Terrorism Amendments to the Foreign Sovereign Immunities Act ("FSIA") (28 U.S.C. § 1602 *et seq.*) and pursuant to the common law of Washington, D.C. and of the Plaintiffs' domicile.

7.    Plaintiffs bring this Complaint as a result of the roles of North Korea and the CGIB in providing material support, as defined by 18 U.S.C. § 2339A, to the Popular Front for the Liberation of Palestine ("PFLP") and the Japanese Red Army ("JRA") terrorist organizations, which were responsible for Plaintiffs' injuries.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction in accordance with the provisions of 28 U.S.C. § 1330(a), § 1331, § 1332(a)(2), § 1605(a)(7) and § 1605 note, *Civil Liability for Acts of State-Sponsored Terrorism*. The Court also exercises in personam jurisdiction over the Defendant in accordance with the provisions of 28 U.S.C. § 1605(a)(7) and § 1330(b). These recently-enacted counterterrorism provisions create federal causes of action for wrongful death, personal injury and related torts against state sponsors of terrorism and their officials, employees and agents.

9.    Venue in this Court is proper in accordance with the provisions of 28 U.S.C. § 1391(f)(4), which provides in pertinent part that a civil action against a foreign state may be brought in the United States District Court, District of Columbia.

10.    At all times relevant to this Complaint, Carmelo Calderón-Molina was domiciled

in Puerto Rico and was a national of the United States.

11.    At all times relevant to this Complaint, Plaintiffs were domiciled in Puerto Rico and were nationals of the United States.

12.    Defendant North Korea is a foreign state designated as a state sponsor of terrorism pursuant to § 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)). Defendant the CGIB is an agency and instrumentality of Defendant North Korea and at all times relevant to this action was acting within the scope of its agency and office.

## NATURE OF THE ACTION

### The Massacre at the Tel Aviv Airport

13.    On or about May 30, 1972, Carmelo Calderón-Molina and Pablo Tirado-Ayala arrived at Israel's Tel Aviv Airport as part of a large group of Puerto Rican pilgrims making a visit to Christian religious sites in the Holy Land.

14.    As the Plaintiffs attempted to retrieve their luggage from the baggage carousel and pass through Israeli customs, three members of the Japanese Red Army ("JRA"), who had just disembarked from an airline flight arriving from Italy, removed automatic weapons and grenades from their luggage. The terrorists began to fire indiscriminately at the Plaintiffs and other passengers waiting to retrieve their luggage.

15.    The JRA attackers ran through the airport terminal firing and throwing grenades at random.

16.    Two of the attackers eventually ran out of ammunition and were killed by their own hand grenade blasts.

17.    The last attacker, later identified as Kozo Okamoto, attempted to kill himself by throwing a grenade at a near by airplane in an attempt to blow both himself and the plane up.

Okamoto did not succeed in either of his goals and was eventually subdued by an airport employee. Israeli police immediately placed the terrorist under arrest.

18.    When the shooting and grenade attack had stopped, more than twenty-six (26) passengers had been murdered by the JRA terrorists and more than eighty (80) other civilians has been wounded.

19.    The murdered victims included seventeen (17) Puerto Rican pilgrims, including Carmelo Calderón-Molina. Plaintiff Pablo Tirado-Ayala was among the many injured as a result of the attack.

20.    Israeli investigators immediately took the surviving attacker, Kozo Okamoto, into custody and later identified the two dead JRA terrorists as Yasuyuki Yasuda and Takeshi Okudaira. Okudaira was the husband of Fusako Shigenobu, the leader of the JRA at the time.

21.    During subsequent interrogations Kozo admitted that he and his fellow attackers were members of the JRA and that the attack had been carried out in conjunction with the Popular Front for the Liberation of Palestine ("PFLP").

22.    The PFLP also publicly claimed responsibility for the attack, and this was widely reported in the international press.

23.    After the attack, the link between the PFLP, the JRA, and North Korea was widely publicized.

24.    For example, on June 4, 1972, *The New York Times* reported on a prior meeting of PFLP leader George Habash in North Korea with members of the 1970 JRA hijacking team.

## THE PARTIES

### A.    The Plaintiffs

25.    Plaintiffs Ruth  Calderón-Cardona,  Luz  Calderón-Cardona,  Luis  Calderón-

Cardona, Gloria Calderón-Cardona, José Raúl Calderón-Cardona, Hilda Calderón-Cardona, and Salvador Calderón-Martínez are nationals of the United States and residents of Puerto Rico. They are the children of Carmelo Calderón-Molina.

26.    Plaintiff Ruth Calderón-Cardona brings this action individually and on behalf of the Estate of Carmelo Calderón-Molina.

27.    Carmelo Calderón-Molina, then 77 years old, was among the group of pilgrims from Puerto Rico visiting the Holy Land.

28.    Carmelo Calderón-Molina was shot during the course of the terrorist attack. He suffered a laceration to his heart, internal bleeding and broken ribs and died at the scene. It is believed that Carmelo Calderón-Molina was in the process of protecting others when he was shot and killed.

29.    On the day of the attack, Plaintiff Gloria Calderón-Cardona was listening to the radio and learned that the attack had taken place. She also heard her father's name listed among those killed. She telephoned her siblings to inform them that their father had been murdered.

30.    As a result of Carmelo Calderón-Molina's death, Plaintiffs Ruth Calderón-Cardona, Luz Calderón-Cardona, Luis Calderón-Cardona, Gloria Calderón-Cardona, José Raúl Calderón-Cardona, Hilda Calderón-Cardona, and Salvador Calderón-Martínez have experienced emotional pain and suffering, loss of their father's society, companionship, comfort, advice and counsel and have suffered severe mental anguish and extreme emotional distress.

31.    Plaintiff Pablo Tirado-Ayala is a national of the United States and resident of Puerto Rico. Pablo Tirado-Ayala was among the group of pilgrims from Puerto Rico at the Tel Aviv Airport at the time of the terrorist attack.

32.    As a result of the attack, Mr. Tirado-Ayala sustained a gunshot wound to his foot

and experienced severe emotional distress and mental anguish. In addition to obtaining medical treatment, he sought treatment from a mental health professional as a result of the attack.

33.     Plaintiff Antonia Ramirez-Fiero is a national of the United States and resident of Puerto Rico. She is the wife of Plaintiff Pablo Tirado-Ayala.

34.     As a result of the attack and the resulting severe emotional distress of her husband, Antonia Ramirez suffered loss of companionship and aspects of her husband's society.

## B.    The Defendants

35.     Defendant North Korea is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603.

36.     Defendant has been designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)).

37.     Defendant the CGIB is Defendant North Korea's main intelligence and security agency. The CGIB is an agency and instrumentality of Defendant North Korea, and at all times relevant to this action was acting within the scope of its agency and office.

38.     The communist government of North Korea is politically and ideologically hostile to Japan, South Korea, and other Western oriented nations and has consistently sponsored acts of international terrorism.

## FACTUAL ALLEGATIONS

### The Popular Front for the Liberation of Palestine ("PFLP")

38.     The Popular Front for the Liberation of Palestine ("PFLP") is a Palestinian terrorist organization founded by George Habash as a break-away faction of the Arab Nationalist Movement in 1967. The PFLP professes a Marxist-Leninist ideology and engages in terrorist attacks against the State of Israel. The PFLP is committed to carrying out its terror attacks as

part of what it views as a broader revolutionary war against what its leaders have declared as a broader revolutionary war against "Western imperialism."

39.    The PFLP was one of the founding movements of the Palestine Liberation Organization ("PLO") and has been one of its largest factions.

40.    The United States government has designated the PFLP a Foreign Terrorist Organization ("FTO"), a Specially Designated Terrorist organization ("SDT"), and a Specially Designated Global Terrorist organization ("SDGT").

**The Japanese Red Army ("JRA")**

41.    The Japanese Red Army ("JRA") is a Japanese terrorist group that was formed by radical students in Japan around 1970. The JRA was founded as a break-away faction of the Japanese Communist League–Red Army Faction by dissident members who sharply disputed the non-violent direction of the parent organization.

42.    The JRA's historical goal has been to overthrow the Japanese government and monarchy and to help foment world revolution through the use of violence and terrorist attacks.

43.    One of the JRA's founding leaders, Fusako Shigenobu, lobbied the organization to expand its terrorist activities to stretch far beyond the borders of Japan and to internationalize the target of its violence to include all Western governments.

44.    In keeping with its emerging ideology as an anti-Western terrorist organization being launched in the early 1970s and, keeping with the political times, Shigenobu declared that the forefront of the JRA's battle against international imperialism should be in "Palestine" and focused against the Israeli government.

45.    In an effort to forge a connection between the JRA and the PLO, in 1971, Shigenbu traveled from Japan to Beirut, Lebanon and made contact with the leadership of the

PFLP.

46.     Another of the founding leaders of the JRA was Takeshi Okamoto.  Along with his younger brother Kozo, Takeshi attended the large JRA conferences that were held for several days in Japan in early 1970, and which were instrumental in launching the organization's radical agenda and setting it on the course of committing acts of terrorism to advance its radical ideology.

## Defendant North Korea Has Routinely Provided Material Support to the JRA and PFLP

47.     Defendant North Korea has provided the JRA with lodging, safehouses, funding, weapons, military training and other material support both prior and subsequent to the terrorist attack on May 30, 1972 that killed Carmelo Calderón-Molina and injured the Plaintiffs.

48.     Several JRA hijackers, including Takeshi Okamoto, took refuge in North Korea following a March, 1970 hijacking of a Japan Airlines flight. In fact, the government of North Korea provided the JRA terrorists with lodging, safehouses, facilities, communications equipment and transportation and permitted them to live freely and to meet with other terrorists and revolutionaries who traveled to North Korea. Following the hijacking, North Korea became a key operations center and international base for the JRA.

49.     The government of North Korea provided its assistance and material support to the JRA through its intelligence service, the CGIB, an agency and instrumentality of North Korea.

50.     The safe haven and support that North Korea provided these hijackers has remained a fierce and ongoing diplomatic point of contention between North Korea and Japan. The United States government has announced that North Korea's harboring of these JRA hijackers is one of the many justifications for North Korea's inclusion on the U.S. list of state

sponsors of terrorism.

51.    After the Tel Aviv Airport attack, Israeli security agencies began to seriously investigate the close links between North Korea, the JRA and the PFLP.

52.    The North Korean government trained members of the PLO, PFLP and other terrorist organizations in the 1960s, 1970s and 1980s, and this training was conducted in, among other places, North Korea, Lebanon, and the People's Democratic Republic of Yemen (a.k.a. South Yemen, a state in present-day southern Yemen that united with the Yemen Arab Republic in 1990 to form the current Republic of Yemen).

53.    In fact, on or about September 1970, George Habash, the leader of the PFLP, traveled to North Korea where he met with North Korean officials and received assurances of North Korean support for the PFLP. It was also during this visit that, under the auspices of the North Korean government, George Habash was introduced to the nine JRA hijackers who were living and operating freely in North Korea.

54.    As a result of this meeting between George Habash and the JRA, an agreement was reached whereby the PFLP and the JRA would cooperate in joint terrorist attacks and propaganda efforts in the future.

55.    Thereafter, North Korean instructors provided guerilla warfare training and other expert advice and guidance on terrorism to members of the PFLP and the JRA in the PFLP's training bases in the Beka'a Valley in Lebanon.

56.    Prior to the Tel Aviv Airport attack, in the fall of 1971, Kozo Okamoto received a call from another member of the JRA who informed him that several members of the JRA would be accompanying a Palestinian representative of the PFLP who would be visiting Japan, and that Kozo was to help arrange a place for the showing of a film entitled "Declaration of World War

by the Red Army and the PFLP."

57.    In September 1971, Kozo Okamoto was also contacted by a member of the JRA who offered him the chance to travel to Beirut, Lebanon for guerilla warfare training to further the goals of the JRA. Because Kozo was eager to participate in the JRA's campaign of world revolution and to follow in the footsteps of his older brother, Takeshi Okamoto, now based in North Korea, the younger brother quickly agreed.

58.    Several months later, Kozo Okamoto was contacted by Takao Himori, a former college student and a JRA member who had recently visited Beirut. Himori provided Kozo with money for his trip to Lebanon.

59.    On or about February 26, 1972, Kozo Okamoto boarded a Canadian Pacific Airlines jet bound for Montreal. He stayed one night in Montreal, and then traveled to New York where he proceeded on to Paris and then finally to Lebanon.

60.    In Lebanon, Kozo Okamoto eventually met the other two Tel Aviv bound terrorists, Takeshi Okudaira and Yasuyuki Yasuda, and another member of the JRA, Osamu Maruoka, who would later carry out a number of international hijackings.

61.    These four members of the JRA were trained in guerilla warfare in the PFLP's terrorist camps in Lebanon, and were given expert advice in terrorism, and provided with other material support by the PFLP and North Korea.

62.    After more than two months of training Takeshi Okudaira informed Kozo Okamoto and Yasuyuki Yasuda that they were to carry out a suicide mission against Israel's Tel Aviv Airport to further world revolution, and they were briefed on the specifics of the attack and given false passports. One of the dates of birth on these false passports corresponded with the date of the JRA hijacking to North Korea in 1970 that was conducted by Kozo Okamoto's

brother.

63.    After finishing their training in Lebanon, the three attackers traveled through Europe and finally to Rome, where they stayed for several days and took photos of various tourist attractions before departing for Tel Aviv to murder and maim innocent travelers.

64.    Following his arrest for the Tel Aviv Airport attack, Kozo Okamoto voluntarily confessed to Israeli security officials his role in the terrorist attack and the murder of twenty-six (26) passengers.

65.    On July 18, 1972, an Israeli court found Kozo Okamoto guilty of the twenty-six (26) murders and sentenced him to life imprisonment.

66.    In May 1985, Israel entered into a prisoner release agreement with the PFLP.  In exchange for the return of three Israeli soldiers captured by the PFLP during Israel's 1982 war against Lebanon, the Israeli government agreed to free 1,150 Palestinian terrorist prisoners.

67.    After serving only 13 years of his life prison sentence, Kozo Okamoto was released and resurfaced at a press conference with Shigenobu in Libya.

68.    Upon information and belief, Kozo Okamoto thereafter traveled to North Korea where he resides today.

69.    In 1988, then U.S. Secretary of State George P. Shultz, in accordance with Section 6(j) of the Export Administration Act of 1979, designated North Korea a state sponsor of terrorism because "North Korea is a country which has repeatedly provided support for acts of international terrorism."

70.    Prior to this designation the United States government had publicly noted North Korea's support for terrorism, and, for example, the Department of State's report titled "Patterns of Global Terrorism: 1985" noted that "P'yongyang almost certainly has continued to provide

training, funds, and weapons to various foreign extremist groups." In "Patterns of Global Terrorism: 1988" the U.S. government noted that North Korea continued to support members of the JRA including a faction "based in P'yongyang."

71.    As a result of North Korea's provision of material support and resources, as defined by 18 U.S.C. § 2339A, to members of the JRA and PFLP, including, but not limited to the provision of lodging, safehouses, funds, communications equipment, facilities, training and expert advice, North Korea has caused and engaged in acts of torture and extrajudicial killings as those terms are defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350, notes) and has caused Plaintiffs harm for which Plaintiffs now bring these claims.

72.    During the period relevant hereto, Defendant North Korea provided the JRA and PFLP with material support and resources within the meaning of 28 U.S.C. § 1605(a)(7), in order to facilitate and further the commission of terrorist attacks by the JRA and the PFLP. Such support was provided routinely and in furtherance of a specific policy of terror sponsorship on the part of Defendant North Korea.

73.    The material support and resources provided by Defendants to the JRA and PFLP included, among other things: military and other training; training bases; facilities for, *inter alia*, training, storage of weapons and explosives and the maintenance and operation of a leadership command and operational infrastructure; safe haven; lodging; means of communication and communications equipment; financial services, including banking and wire transfer services; means of transportation; and essential utilities.

74.    The North Korean intelligence agency, the CGIB, provided material support and resources to the PFLP and the JRA on behalf of Defendant North Korea and in furtherance of its policies while acting within the scope of their office, employment and agency.

75.     At all relevant times, Defendant the CGIB was an agent, representative and/or office of Defendant North Korea acting within the scope of its agency and/or office.

76.     At all relevant times, the CGIB engaged in the actions described herein within the scope of its agency and/or office and to further the interests of Defendant North Korea. Accordingly, Defendant North Korea is vicariously liable for the acts of the CGIB, and subsequently the JRA and the PFLP.

77.     During the period relevant hereto, Defendants provided the JRA and the PFLP and its operatives with training bases and facilities on North Korean territory.

78.     The JRA and the PFLP and its operatives utilized the training bases and facilities provided by Defendants to train for the commission of acts of terrorism. This training included the use of firearms, explosives and other weapons. The JRA and the PFLP and its operatives also utilized these bases and facilities as depots for storage of weapons and explosives.

79.     The JRA and the PFLP and its operatives also utilized the training bases and facilities provided by Defendants to establish, maintain and operate a leadership command, organizational hierarchy and operational infrastructure.

80.     Additionally, at all times relevant hereto, Defendants provided the JRA and the PFLP and its operatives with instruction and training in terrorism activities including the use of weapons and explosives (the foregoing allegations collectively referred to herein as the "Terrorist Training").

81.     Terrorist Training was provided to the JRA and the PFLP and its operatives by and through North Korean military and intelligence officials, and other agents, employees and officials of Defendants North Korea and acting under the command and direction of Defendants.

82.     At all times relevant hereto, Defendants provided the JRA and its leaders, officials

and operatives with lodging, safe haven and shelter, in order to prevent them from being apprehended and permit them to conduct their terrorist activities freely and unhindered.

83.    In order to facilitate and further the commission of terrorist attacks by the JRA and the PFLP, Defendant gave substantial aid, assistance and encouragement to the JRA and the PFLP, and knowingly and willingly conspired, agreed and acted in concert with one another and with the JRA and the PFLP, in pursuance of a common plan and design, to provide material support and resources to the JRA and the PFLP.

84.    In light of the above, this Court should find North Korea and the CGIB are liable under 28 U.S.C. § 1605 *et seq.* for the extrajudicial killings and injury of American citizens in the shooting and grenade attack perpetrated at Tel Aviv Airport.

## FIRST CLAIM FO RELIEF
## AS AGAINST ALL DEFENDANTS
## ON BEHALF OF THE ESTATE OF CARMELO CALDERÓN-MOLINA
## WRONGFUL DEATH PURSUANT TO
## PUERTO RICAN LAW OR OTHER APPLICABLE LAW

85.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

86.    Defendants provided material support and resources to the JRA in order to facilitate and further the commission of terrorist attacks by the JRA and its operatives. Decedent Carmelo Calderón-Molina was killed by gunshot and resulting injuries from the attack by the JRA and its operatives acting with the material support, resources and sponsorship of Defendants.

87.    Defendants' actions were willful, malicious, intentional, reckless and unlawful and helped cause the death of decedent Carmelo Calderón-Molina.

88.    The murder of Carmelo Calderón-Molina was an act of extrajudicial killing within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605, note.

89.    The murder of Carmelo Calderón-Molina was perpetrated by the JRA and its operatives, which received material support and resources from Defendants.

90.    At the time of his death, decedent Carmelo Calderón-Molina left surviving Plaintiffs Ruth Calderón-Cardona, Luz Calderón-Cardona, Luis Calderón-Cardona, Gloria Calderón-Cardona, José Raúl Calderón-Cardona, Hilda Calderón-Cardona, Salvador Calderón-Martínez, and his son, Miguel Calderón-Cardona, and his wife, Eladia Cardona-Rosario as his only heirs and survivors.

91.    Eladia Cardona-Rosario and Miguel Calderón-Cardona have also died since the attack.

92.    At the time of his death, decedent Carmelo Calderón-Molina was 77 years of age and enjoying good health. He was industrious and in possession of all his faculties. As a result of the death of Carmelo Calderón-Molina, his Estate has suffered pecuniary loss, and has necessarily paid funeral expenses and various other expenses.

93.    By reason of the foregoing, the Estate of Carmelo Calderón-Molina has been damaged in an amount to be determined at trial.

94.    Defendants' conduct as described herein was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large. The Estate of Carmelo Calderón-Molina is therefore entitled to an award of punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### AS AGAINST ALL DEFENDANTS ON BEHALF OF
### DECEDENT CARMELO CALDERÓN-MOLINA,
### ESTATE OF CARMELO CALDERÓN-MOLINA
### PAIN, SUFFERING AND SURVIVAL DAMAGES PURSUANT TO
### PUERTO RICAN LAW OR OTHER APPLICABLE LAW

95.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

96.     As a result of the terrorist attack caused by Defendants' actions described herein, prior to his death, decedent Carmelo Calderón-Molina sustained severe injuries to his body and suffered great pain, shock and physical and mental anguish.

97.     By reason of the above, decedent Carmelo Calderón-Molina and his Estate are entitled to damages in an amount to be determined at trial.

98.     Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large. Decedent Carmelo Calderón-Molina and his Estate are therefore entitled to an award of punitive damages against Defendants in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS PURSUANT TO
### PUERTO RICAN LAW OR OTHER APPLICABLE COMMON LAW

99.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

100.    Defendants' conduct was willful, outrageous, egregious, and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

101.    Defendants intended to and did in fact terrorize the Plaintiffs and cause them

severe emotional distress.

102.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large warranting an award of punitive damages.

### FOURTH CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS ON BEHALF OF THE PLAINTIFFS
### LOSS OF SOLATIUM PURSUANT TO
### PUERTO RICAN LAW OR OTHER APPLICABLE LAW

103.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

104.    At all relevant times, Plaintiffs Ruth Calderón-Cardona, Luz Calderón-Cardona, Luis Calderón-Cardona, Gloria Calderón-Cardona, José Raúl Calderón-Cardona, Ana Delia Calderón-Cardona, Hilda Calderón-Cardona, and Salvador Calderón-Martínez were the children of Carmelo Calderón-Molina.

105.    As a result, and by reason of the death of Carmelo Calderón-Molina, which was caused by the actions of Defendants described herein, these Plaintiffs have been deprived of the services, society and solatium of their deceased father, and have suffered severe mental anguish, bereavement and grief, and injury to their feelings.

106.    At all relevant times, Plaintiff Antonia Ramirez-Fiero was the wife of Plaintiff Pablo Tirado-Ayala.

107.    As a result, and by reason of the injuries sustained by Pablo Tirado-Ayala, which were caused by the actions of Defendants described herein, Plaintiff Antonia Ramirez-Fiero has been deprived of the services, society and consortium of her husband, and has suffered severe mental anguish, and injury to her feelings.

108.  Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large.  Plaintiffs are therefore entitled to an award of punitive damages against Defendants in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF
AGAINST ALL DEFENDANTS
ON BEHALF OF THE PLAINTIFFS
BATTERY PURSUANT TO
PUERTO RICAN LAW OR OTHER APPLICABLE COMMON LAW**

109.  Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

110.  The terrorist attack constituted a battery on the person of Carmelo Calderón-Molina and Pablo Tirado-Ayala.

111.  The terrorist attack caused Pablo Tirado-Ayala severe physical and psychological injuries, extreme pain, suffering and severe financial loss, including deprivation of present and future income.

112.  As a result of the severe injuries inflicted on him by the terrorist attack, Pablo Tirado-Ayala required medical treatment.

113.  The terrorist attack, which was an act of extrajudicial killing within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note, was carried out by the JRA and the PFLP acting with the material support, resources and sponsorship of the other Defendants. The terrorist attack was caused and facilitated by Defendants' actions.

114.  Defendants' actions were willful, malicious, intentional, reckless, and unlawful and were the proximate cause of the terrorist attack and the battery on the person of Carmelo Calderón-Molina and Pablo Tirado-Ayala, and the injuries Plaintiffs suffered therein.

115.   Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public warranting an award of punitive damages.

## SIXTH CLAIM FOR RELIEF
## AGAINST ALL DEFENDANTS
## ON BEHALF OF THE PLAINTIFFS
## ASSAULT PURSUANT TO
## PUERTO RICAN LAW OR OTHER APPLICABLE COMMON LAW

116.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

117.   The terrorist attack and the ensuing carnage caused Plaintiffs fear and apprehension of harm and death, and actual physical harm, and constituted assaults on Carmelo Calderón-Molina and Pablo Tirado-Ayala.

118.   The terrorist attack and assaults on their persons, which were direct and proximate results of Defendants' actions, caused Carmelo Calderón-Molina and Pablo Tirado-Ayala extreme mental anguish and actual physical injury and pain and suffering.

119.   Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public warranting an award of punitive damages.

## SEVENTH CAUSE OF ACTION
## AS AGAINST ALL DEFENDANTS
## ON BEHALF OF PLAINTIFFS
## CIVIL CONSPIRACY
## PURSUANT TO PUERTO RICAN LAW

120.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

121.   Defendants knowingly and willingly conspired, planned and agreed to sponsor and provide material support and resources for the commission of acts of extrajudicial killing by terrorist organizations, including the attack at the airport in which decedent Carmelo Calderón-

Molina was killed and Pablo Tirado-Ayala was injured.

122.   As a result and by reason of the death of Carmelo Calderón-Molina and the injuries sustained by Pablo Tirado-Ayala, which were caused by Defendants' conspiracy described herein, Plaintiffs suffered the damages enumerated herein. Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages.

**EIGHTH CAUSE OF ACTION**
**AS AGAINST ALL DEFENDANTS**
**ON BEHALF OF PLAINTIFFS**
**AIDING AND ABETTING**
**PURSUANT TO PUERTO RICAN LAW**

123.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

124.   Defendants knowingly and willingly carried out tortious acts in concert with others pursuant to a common design, which resulted in extrajudicial killings by terrorist organizations, including the terrorist attack at the airport in which decedent Carmelo Calderón-Molina was killed and Pablo Tirado-Ayala was injured.

125.   As a result and by reason of the death of Carmelo Calderón-Molina and the injuries sustained by Pablo Tirado-Ayala, which were caused by Defendants' aiding and abetting described herein, Plaintiffs suffered the damages enumerated herein. Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

      (a)    Accept jurisdiction over this action;

      (b)    Enter judgment against Defendants in favor of each Plaintiff for

compensatory damages in amounts to be determined at trial;

      (c)    Enter judgment against Defendant the CGIB in favor of each Plaintiff for

punitive damages;

      (d)    Enter judgment against Defendants in favor of each Plaintiff for any and

all costs sustained in connection with the prosecution of this action, including attorneys' fees;

and

      (e)    Grant such other and further relief as justice requires.


PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: April 24, 2006
      Washington, D.C.


                             CLIFFORD & GARDE

              By     *John M. Clifford*
                             John M. Clifford,
                             D.C. Bar No. 191866
                             1707 L Street, N.W. Suite 500
                             Washington, DC 20036
                             Telephone:   (202) 289-8900
                             Facsimile:   (202) 289-8992

                             Attorneys for Plaintiffs


OSEN & ASSOCIATE, LLC
Gary M. Osen *(pro hac vice application to be filed)*
Naomi B. Weinberg *(pro hac vice application to be filed)*
Aaron Schlanger *(pro hac vice application to be filed)*
700 Kinderkamack Road
Oradell, New Jersey 07649
Telephone:   (201) 265-6400
Facsimile:   (201) 265-0303

NITSANA DARSHAN-LEITNER & ASSOCIATES
Nitsana Darshan-Leitner, Esq.
11 Havatikim Street
Petah Tikva,  49389 Israel
Telephone:     (972) 03-7361519
Facsimile:     (972) 03-7361520